## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## GREAT FALLS DIVISION

| | |
|---|---|
| **RHETT CRANTZ, Individually, as Personal Representative of the Estate of Venus Crantz/ and as Guardian of Marina Crantz, Marley Crantz, McKenzy Crantz, and Maisen Crantz,**<br><br>**Plaintiff,**<br>**vs.**<br><br>**UNITED STATES OF AMERICA,**<br><br>**Defendant.** | **CV 14-56-GF-BMM-JTJ**<br><br>**FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER** |

This matter came before the Court for trial without a jury, the Honorable Brian Morris presiding, on October 11 and 12, 2016. The plaintiff, Rhett Crantz, was represented by Timothy M. Bechtold and Kristine M. Akland. The defendant, United States of America, was represented by Assistant United States Attorney, Timothy J. Cavan.

Witnesses were sworn and testified, and certain exhibits were offered and received into evidence. From the evidence presented, the Court makes the following:

1

# I.  FINDINGS OF FACT:

## A.    JURISDICTION AND VENUE

1.  This is a negligence action brought by the plaintiff pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. § 2671, *et seq*.  The plaintiff seeks to recover damages from the United States based on medical care provided to Venus Crantz (Venus) by health care providers employed by the Department of Health and Human Services, Indian Health Service (IHS).  The plaintiff alleges that IHS providers negligently treated Venus when she presented to the emergency department of the Fort Belknap Hospital, resulting in her death.  (Doc. 1).

2.  At the time this action was filed, the plaintiff was a resident of the State of Montana, and lived in Blaine County, Montana.  The alleged acts and omissions which gave rise to this claim also occurred in Blaine County, Montana.

3.  The plaintiff submitted administrative tort claims with the IHS on or about January 31, 2014.  The plaintiff filed the present action on August 18, 2014, more than six months after submitting his administrative claim, without a final determination by the agency.

## B.    BACKGROUND

4.  Venus was born in 1979 in Harlem, Montana, and died on December 9, 2013.  She was an enrolled member of the Assiniboine and Gros Ventre Tribes, and lived in Harlem on the Fort Belknap Indian Reservation.  She received the

majority of her medical care during her life through the IHS Fort Belknap medical facility in Harlem.

5.  Venus married Rhett Crantz in 2004, and they had four children together: Marina Crantz, born in 1996; Marley Crantz, born in 2002; Mackenzy Crantz, born in 2006; and Maisen Crantz, born in 2013.

6.  Venus attended high school, and later obtained her certification as a certified nursing assistant.  She was employed part-time as a nursing assistant by Sweet Memorial Nursing Home in Chinook, Montana at the time of her death. (Deposition of Joni Myhre). She had been employed by Sweet Memorial since May 7, 2013.

C.    MEDICAL HISTORY

7.  Venus's medical history is significant for ongoing bouts of asthma. Venus was first diagnosed with asthma in 2008.  Venus presented to the emergency department (ED) for acute asthma attacks at least 10 times in the years that followed.  Her difficulties with asthma accelerated sharply in the last 1.5 years of her life, with approximately 13 contacts with physicians and emergency visits occurring in 2013 alone.

8.  Venus's asthma also progressively limited her personal and work activities.  A walk around the block with her young child could lead to coughing

spells that would require Venus to return home.  She also missed several days of work because of her asthma.

D.     DECEMBER 9, 2013 ASTHMA ATTACK

9.  Venus was driving with her husband in Harlem on December 9, 2013, when she began to experience respiratory difficulties.  She returned home for a nebulizer treatment at approximately 7:00 p.m.  Venus had three home nebulizer treatments, but they were not effective.

10.  Venus remained at home for approximately 1 to 1.5 hours before William Abieta, her adopted brother, took her to the hospital for treatment.  It took approximately 3.5 to 4 minutes to travel from Venus's residence to the hospital.  Abieta dropped Venus off at the ED entrance.

11.  Venus barely could breathe by the time that she arrived at the ED.  She walked up to the nurse's station window in the emergency room and mouthed "I can't breathe."

12.  Two nurses, Kathleen Olver and Shauna Gilbert-Azure, and an IHS physician, Amy Kroeger, M.D, staffed the Fort Belknap Hospital Emergency Department that night.  Dr. Kroeger is a licensed physician.  She also attended a residency program in emergency medicine at Washington University from 2008 to 2011.  She did not complete the residency program, however, and lacks board certification in any specialty.

13.  Nurse Olver staffed the nurse's station window in the ED when Venus arrived.  Dr. Kroeger also observed Venus approach.  Nurse Olver and Dr. Kroeger promptly escorted Venus to a critical care patient room.  Dr. Kroeger also leaned into another patient room, and told a second IHS nurse, Shauna Gilbert-Azure, that her assistance would be needed.  When Gilbert-Azure responded, Dr. Kroeger sent her to retrieve additional respiratory medications, and to summon additional assistance from EMTs.

14.  Nurse Olver attempted to record the timing of events  She testified that she looked at a clock in the critical care room when she started an IV for Venus and recorded the time at 8:20 p.m.  She estimated the timing of events for the medical record, before and after 8:20 p.m., based upon the time each intervention typically takes to accomplish.

15.  According to Nurse Olver's tracking, Venus presented to the nurses' station window at approximately 8:16 p.m.  Within one minute, medical staff escorted Venus back to the critical care room and started an Albuterol nebulizer.  Venus's oxygen saturation level increased after the treatment from 87% to 95%.

16.  Medical staff started a second nebulizer treatment with racemic epinephrine at 8:19 p.m.  Medical staff started an IV line by 8:20 p.m., and they administered magnesium sulfate at 8:22 p.m.

17.  Dr. Kroeger continued to monitor and assess Venus's respirations, breath sounds, and pulse.  Dr. Kroeger detected that Venus began to deteriorate rapidly as the administration of magnesium sulfate was completed.  Venus's pulse became "thready," her heart rate increased, and her breath sounds became less audible.

18.  Venus collapsed at approximately 8:23 p.m.  Dr. Kroeger continued to assess her cardiac and respiratory status. Dr. Kroeger determined that Venus was in respiratory arrest.  She was also unable to detect a pulse, and determined that Venus had gone into cardiac arrest almost simultaneously with her respiratory arrest.  Venus continued to display pulseless electric activity ("PEA"). PEA describes cardiac electric activity that is too unordered to be considered a pulse.

19.  Dr. Kroeger initiated cardiopulmonary resuscitation (CPR) after Venus's collapse.  Medical staff immediately started ventilation with the use of a bag valve mask. They also initiated chest compressions.

20.  A bag valve mask is a breathing device.  A padded mask fits over the patient's mouth and provides a seal around the mouth.  Pressurized oxygen connects to the device. The medical provider forces oxygen into the patient's lungs by squeezing a self-inflating bag.

21.  Dr. Kroeger and Nurses Olver and Gilbert-Azure continued resuscitation efforts for the next six minutes.  Nurse Gilbert-Azure ventilated Venus with the bag valve mask and managed the airway.

22.  One EMT arrived at approximately 8:29 p.m., and began assisting with chest compressions.  The arrival of the EMT prompted Dr. Kroeger to attempt for the first time an endotracheal intubation of Venus.  Intubation involves the placement of an endotracheal tube through the vocal cords and into the trachea.  A provider must be able to visualize the patient's vocal cords in order to perform the procedure safely.

23.  Dr. Kroeger attempted to perform an intubation at 8:29 p.m., but she could not adequately visualize Venus's vocal cords.  She aborted the attempt. Medical staff restarted the bag valve mask in an attempt to provide ventilation. The medical team also continued CPR after withdrawing from the first intubation attempt.

24.  Venus's IV became dislodged at approximately 8:33 p.m.  The IV had to be restarted in order to administer medications.  Medical staff restarted the IV by 8:36 p.m., and began to administer Epinephrine at 8:38 p.m.  Additional EMT assistance also arrived at this time.

25.  Dr. Kroeger waited 9 minutes after the first failed intubation attempt before making a second intubation attempt.  Vomitus in Venus's airway obscured

Dr. Kroeger's ability to visualize the vocal cords on the second attempt. Medical staff suctioned this area. Dr. Kroeger remained unable to visualize Venus's vocal cords.

26. Dr. Kroeger abandoned the second intubation attempt and chose instead to start an alternative airway at 8:39 p.m., with the insertion of a combitube. The combitube is a "blind insertion" airway device intended to be placed at the top of a patient's throat, above the glottis, or supraglottis. The combitube does not require that the provider visualize the vocal cords.

27. Medical staff administered several additional medications. Medical staff also continued to administer CPR protocol for 45 minutes. The medical team proved unable to reestablish spontaneous circulation or respiration. Dr. Kroeger called the code at 9:08 p.m.

E. STANDARD OF CARE

28. Both parties presented doctors qualified to testify regarding the appropriate standard of care in this case. The competing conclusions by these witnesses reflect a difference in their view regarding the appropriate standard of care to be applied in this case in light of the training and experience possessed by Dr. Kroeger.

29. The plaintiff called Gregory Kazemi, M.D. as a standard of care expert. Dr. Kazemi is a board certified emergency medicine physician. He has practiced at St. Patrick's hospital in Missoula, Montana since completing his residency in 1996.

30. Dr. Kazemi's practice provides him with daily contact with critical access hospitals in rural communities around Montana similar to the Ft. Belknap hospital. He regularly provides advice regarding the care of various patients being seen in the emergency departments at those hospitals.

31. Dr. Kazemi hired a physician in his group at St. Patrick Hospital who trained at Washington University's Emergency Medicine residency at the same time as Dr. Kroeger. Dr. Kazemi has discussed the Washington University Emergency Medicine residency program training with his colleague. Dr. Kazemi possesses familiarity with the training and experience of Dr. Kroeger.

32. Dr. Kroeger's emergency medicine rotations during her residency provided her with training in recognizing the presentation of asthma and in performing the intubation of patients.

33. Dr. Kazemi testified that Dr. Kroeger violated the standard of care when she failed to administer medication to relax Venus's airway after the first failed intubation attempt and when she delayed nine minutes between intubation attempts. Dr. Kazemi opined that this delay caused Venus's death.

34.  Dr. Kazemi testified that the standard of care required Dr. Kroeger to have provided Venus with a paralytic immediately upon the initial intubation failure. Dr. Kazemi testified that the paralytic would have facilitated an intubation attempt regardless of how relaxed Venus may have appeared.

35.  Dr. Kazemi opined that the standard of care required Dr. Kroeger immediately to have given Venus a paralytic after the first intubation failure and then immediately attempt a second intubation.  The standard of care required Dr. Kroeger to have placed a rescue airway, such as a combitube, immediately if the second intubation attempted failed.

36.  Dr. Kazemi testified that oxygen saturation represents only one parameter to assess whether a patient is breathing effectively. In asthma patients, ventilation presents the major problem. Air with oxygen may be going in, but air with carbon dioxide may not be coming out of the lungs.  Dr. Kazemi testified that failure to ventilate a patient properly may result in heart failure.

37.  Dr. Kazemi testified that bag valve masks may be used to oxygenate and ventilate a healthy person with healthy lungs for an extended period of time.  Dr. Kazemi warned, however, that bag valve masks can prove ineffective in asthmatic patients due to the fact that their lungs typically are stiff.

38.  The provider should consider the following factors when evaluating the effectiveness of the bag valve mask: 1) whether air is coming out of the lungs; 2)

whether a proper seal has been evaluated around the mouth; 3) a patient's heart rate and blood pressure. The provider should know that the bag valve mask has not been effective if the patient's vital signs fail or continue to fail.

39. Dr. Kazemi testified that the main treatment for pulseless electric activity as experienced by Venus would be to try to correct the underlying problem, or what caused the PEA. Dr. Kazemi believed that Venus's breathing difficulty caused the PEA.

40. The United States called Gregory Moore, M.D. as an expert on the standard of care. Dr. Moore is a board certified emergency medicine physician, and a fellow in the American College of Emergency Medicine. He has practiced emergency medicine since 1985, and has extensive experience practicing in rural settings.

41. Dr. Moore has practiced in Dillon, Montana since 1996, and is on staff in several other rural hospitals. He also serves as the medical director of a rural outreach program that St. Patrick's Hospital in Missoula, Montana offers that staffs rural facilities with providers of emergency medicine.

42. Dr. Moore applied the standard of care of a competent general practitioner in similar circumstances and similar facilities in the United States. Dr. Moore testified that all of the care provided to Venus by the IHS medical team on December 9, 2013, met the standard of care.

43. Dr. Moore testified that medical staff did not delay in the recognition of Venus's condition or in the initiation of treatment. Medical staff immediately recognized Venus's respiratory distress when she presented to the emergency department triage window. Medical staff promptly escorted Venus to a critical care room.

44. Dr. Moore believes that medical staff properly initiated an Albuterol nebulizer within one minute of Venus's arrival. Dr. Moore explained that Albuterol is a beta agonist, commonly used as the first line of treatment for suspected asthma. Medical staff also timely established an IV, and gave magnesium sulfate to Venus within six minutes of her arrival at the E.D.

45. Dr. Moore testified that Venus responded favorably to the initial treatment. Venus became anxious and combative, however, while the magnesium sulfate was being infused. Venus quickly collapsed into respiratory arrest. Dr. Moore noted that Venus's collapse occurred within 7 minutes of arrival. He opined that seven minutes would have provided inadequate time to intubate before Venus's arrest.

46. Dr. Moore testified that medical staff appropriately provided ventilation with a bag valve mask after her collapse. Dr. Moore explained that the bag valve mask represents the primary "go-to" airway.

47.  Dr. Moore also explained that the 2010 Advanced Cardiac Life Support guidelines ("ACLS guidelines") substantially changed the approach to cardiac/respiratory arrest.  Former guidelines placed the primary emphasis on securing an airway and breathing.  With the 2010 guidelines, however, the primary focus shifted to circulation, with breathing and airway secondary.

48.  Dr. Moore also testified that failed intubations do occur.  Common causes are either mucus, blood or vomitus in the airway, or a patient's unique anatomy that makes it difficult to visualize the vocal cords.  Dr. Kroeger testified that the lack of structure to Venus's mouth made visualization of the airway difficult.  Dr. Moore testified that Dr. Kroeger responded appropriately to the second failed attempt to intubate Venus by immediately resuming ventilation with a bag valve mask.

49.  Dr. Moore further testified that Dr. Kroeger appropriately turned to the combitube after the failed second intubation attempt.  Dr. Moore explained that the combitube is a well-recognized airway.

50.  Dr. Moore concluded that Dr. Kroeger followed ACLS protocol throughout the resuscitation effort.  He further testified that Dr. Kroeger responded within the standard of care to treat Venus's presumed asthma exacerbation. Dr. Moore determined that Dr. Kroeger responded within the standard of care to Venus's respiratory/cardiac arrest.  And Dr. Moore testified that the actions taken

by Dr. Kroeger to provide ventilation to Venus after her arrest all fell within the standard of care.

51.  Dr. Moore seemed to lack familiarity with Dr. Kroeger's training and experience. He believed that Dr. Kroeger had completed 18 months of her residency training, when, in fact, she actually had spent about three years in her residency program. Dr. Moore lacked understanding of the specific training that Dr. Kroeger had received during the residency. He also lacked awareness of the evaluations that she had received in the residency program. Moreover, Dr. Moore believed that Dr. Kroeger had worked only four shifts at the Ft. Belknap ED before December 9, 2013. Dr. Kroeger actually had worked at the Ft. Belknap ED for almost nine months by December 9, 2013.

52.  Both Dr. Kazemi and Dr. Moore testified that the inability to recognize the signs and symptoms of asthma would violate the standard of care by a doctor providing care in a critical access hospital in Montana.

53.  Both Dr. Kazemi and Dr. Moore testified that a failure to intubate Venus before respiratory arrest would have violated the standard of care if a doctor had recognized that Venus's asthma exacerbations were life-threatening.

54.  Venus's asthma exacerbation proved life-threatening when she presented to the Ft. Belknap ED on December 9, 2016.  Dr. Kroeger testified that she believed it would not have been preferable to intubate Venus before her

respiratory arrest. Both Dr. Kazemi and Dr. Moore opined to the contrary, as they believed that Venus's inability to breathe likely pushed her into cardiac arrest.

55. The ACLS guidelines provide that a bag valve mask typically represents an acceptable way to ventilate. The ACLS guidelines further provide that "all healthcare providers should be trained in delivering effective oxygenation and ventilation with a bag and mask." The ACLS guidelines recognize, however, that there will be times when ventilation with a bag mask device proves inadequate. ACLS providers also should be trained and experienced in insertion of an advanced airway.

56. Dr. Kroeger apparently recognized that the bag valve mask did not provide an effective airway, as evidenced by her attempted intubation of Venus. Dr. Moore agreed that the bag valve mask proved inadequate in Venus's case.

57. Respiratory arrest represented the underlying problem in Venus's case. To correct Venus's breathing situation provided the best chance for Venus's survival. Dr. Kazemi opined that Venus likely would have survived if Dr. Kroeger successfully had intubated or placed an emergency airway in a timely manner.

58. The parties disagree as to the appropriate standard of care. Dr. Kazemi applied an individualized standard of care based upon Dr. Kroeger's training and experience, including her residency program in emergency medicine at Washington University. Dr. Moore applied a standard for a general practice

physician.  The Court need not resolve this dispute definitively as Dr. Kroeger's actions failed to satisfy either standard of care.

59.  Dr. Kazemi agreed that the great majority of the care provided to Venus by Dr. Kroeger had been reasonable and appropriate, and had fallen within the standard of care.  He testified that the initial response to Venus's presentation had been appropriate and timely.  The IHS providers immediately recognized Venus's condition, and timely started appropriate treatments.

60.  Dr. Kazemi also testified that starting an IV, administering magnesium sulfate, and summoning more help were all done appropriately, and in a timely manner.  Dr. Kazemi further testified that, once Venus collapsed into respiratory and cardiac arrest, it would have been appropriate to try to restore circulation and respiration.

61.  Dr. Kazemi criticized the nine minute delay between the first intubation attempt at 8:29 p.m. and the second attempt at 8:38 p.m.  Dr. Kazemi testified that a second intubation should have been attempted sooner.  He testified that the number one priority should have been to establish an airway.  He also believes that Dr. Kroeger should have administered medications to relax the airway after the first attempt.

62.  Dr. Kazemi further testified that medications known as paralytics can be effective in relaxing the vocal cords and muscles around the airway to facilitate

intubation.  Dr. Kazemi opined that Dr. Kroeger should have administered the paralytic immediately after the first failed intubation to allow the medication to be effective.

63.  Dr. Moore agreed that paralytics can be used prior to arrest to paralyze the muscles in the airway if adequate personnel are available.  Dr. Moore testified, however, that use of a paralytic is simply not indicated after a patient is in respiratory/cardiac arrest.  He explained that after a period of 15-30 seconds in cardiac/respiratory arrest, an unconscious patient's muscles will be completely relaxed, because there is no circulation to the nervous system.

64.  Either standard of care would have required Dr. Kroeger to provide Venus a paralytic immediately upon the initial intubation failure regardless of how relaxed Venus may have appeared. The paralytic would have facilitated an intubation attempt.

65.  Either standard of care required Dr. Kroeger to conclude that the bag valve mask was not working when Venus's vital signs failed to improve before and after the first failed intubation attempt. Either standard of care then would have required Dr. Kroeger to determine that the bag valve mask was inappropriate and to establish a viable airway immediately.

66.  The underlying problem in Venus's case was respiratory arrest.  The best chance for Venus's survival would have been to correct her breathing

situation. Either of the offered standards of care would have required Dr. Kroeger to provide an airway as quickly as possible after Venus slipped into respiratory/cardiac arrest and displayed PEA.

67. Dr. Kroeger's treatment fell below the standard of care, therefore, when she delayed nine minutes between the first and second failed intubation attempts. Either standard of care also would have required Dr. Kroeger to give herself the best chance at the second intubation attempt by first administering a paralytic to Venus before that attempt.

G. DAMAGES

68. The plaintiff called an economist, Matthew Taylor (Taylor), to testify regarding Venus's loss of earnings and earning capacity. Taylor reviewed Venus's tax returns and W-2s from 2008 to 2013.

69. Taylor initially calculated Venus's loss of earnings under three different scenarios. Under "Scenario A" he calculated her loss of past and future earnings based on a three-year average of her earnings from 2011-2013. Under "Scenario B" he calculated the financial loss based on her average earnings during the last 32 weeks of her life; during which time she had been employed by the Sweet Memorial Nursing Home in Chinook. Finally, under "Scenario C" he calculated the loss based on full-time employment at her highest attained hourly rate of $11.50.

70. Taylor added to this financial loss a projected loss of fringe benefits at the rate of 5.6%. Taylor based the fringe benefits on Bureau of Labor statistics for employer costs of employee compensation.

71. Taylor also calculated Venus's loss of household and related services based on the assumption that she would contribute an additional 32.5 hours per week to household services for the remainder of her life expectancy. Taylor valued these household services at $10.00 per hour.

72. Taylor's initial economic analysis inflated Venus's financial loss for several reasons. First, Taylor based his loss of earnings calculations on inflated average earnings. Taylor limited consideration of Venus's earnings to the last three years of her life under Scenario A, and the last 32 weeks of her life for Scenarios B and C.

73. Venus's tax and earnings records showed her earnings history from 2008 to the time of her death as follows:

2008 – $0

2009 – $6,443.80

2010 – $0

2011 - $11,732.34

2012 – $0

2013 – $6,098.71

Consequently, Venus's average earnings during this period were $4,046, rather than the $6,277 used by Taylor for his first scenario.

74. Taylor next assumed that Venus either would continue to work the same number of hours that she had before her death, or actually would increase her work load from 16.65 hours per week to 40 hours per week. Taylor also assumed for purposes of loss of household services, that she would contribute an additional 32.5 hours per week to household services.

75. The evidence presented fails to support these assumptions. Venus suffered from a severe, progressive respiratory condition, that substantially restricted her activities. The condition had caused her either to be late to work, or miss work entirely while working at Sweet Memorial. Venus's supervisor at the nursing home, Joni Myhre, testified that Venus had missed 20 days of work and was late 8 times in the five months before her death. Venus's absences often related to her asthma. Venus's illness eventually would have prevented her from maintaining her employment at Sweet Memorial Nursing Home at the same number of hours as before her death.

76. The Court further finds that these same limitations would have had a substantial impact on Venus's ability to contribute in the household. Venus's husband testified that her activities were very limited, and she sometimes would suffer from respiratory distress when walking her child.

77.   Finally, in his initial evaluation, Taylor assumed that Venus had a 41.9 year life expectancy, and a 24.9 year work life expectancy.  The evidence fails to support Taylor's assumptions that Venus would have had a normal life expectancy and work life expectancy.

78.   The United States called an expert pulmonologist, Holly Strong, M.D., to testify on the issue of life expectancy.  Dr. Strong reviewed Venus's medical records. These records included a pulmonary function study that had been completed on March 13, 2008.

79.   Dr. Strong testified that Venus had severe, persistent asthma, and was at high risk for a fatal asthma attack.  She testified that Venus exhibited multiple risk factors for such an event, including poorly controlled asthma, development of asthma later in life, frequent ED visits, recent corticosteroid use, smoking, and noncompliance with her medication regimen.

80.   Even without an acute fatal attack, Venus's life expectancy and work life expectancy appear to have been limited.  Dr. Strong testified that her 2008 pulmonary function tests showed that Venus already had significant pulmonary dysfunction and impairment at age 28.  Dr. Strong explained that lung function naturally decreases as we age.  As measured in ccs of air capacity, an individual will lose 20 ccs per year.  A smoker will lose an additional 50-100 ccs per year.

An asthmatic will lose an additional 50 ccs per year, with an additional loss of 30 ccs with each severe exacerbation.

81.  A conservative estimate of 100 ccs per year from the date of her pulmonary function test in 2008 would result in Venus's lung capacity being reduced to 1,870 ccs by age 38 (2018), and 870 ccs by age 48 (2028).  At that point, most people are on continuous oxygen, and are highly impaired.

82.  Dr. Strong further testified, based upon a reasonable degree of medical probability, that Venus's life expectancy from the date of her pulmonary function test in 2008 would have been 24 years or less, and that she likely would not have survived beyond 52-53 years of age.

83.  Taylor acknowledged that he had failed to consider any of these factors in preparing his initial evaluation.  Taylor revised his evaluation after having been provided with Dr. Strong's expert disclosure to reflect a declining ability to work, and a reduced life expectancy.  He used a work life expectancy of 14.26 years, and a life expectancy of 25 years.  Taylor recalculated Venus's past and future losses for Scenario A and B using these assumptions: losses based on her average income for the last three years of her life (Scenario A); and losses based on her income for the last 32 months of her life (Scenario B).

84.  Scenario A presents the more reasonable situation for Venus. As noted previously, Venus's health problems impaired her ability to work. The three-year

coverage contemplated by Scenario A better accounts for these impairments. Under Scenario A, Taylor calculated her economic losses as follows: past loss of earnings - $17,040; future loss of earnings - $41,337; loss of past fringe benefits - $954; loss of future fringe benefits - $2,315; and loss of household services - $111,426, for a total of $173,072.

85.  The Court finds, however, that even this evaluation in Scenario A likely inflates Venus's economic loss.  The evaluation in Scenario A considered only Venus's final three years of employment from 2011-2013. The evaluation ignores the fact that Venus had been unemployed and without income for two of the previous three years.  The evaluation further disregards Venus's physical condition and the effect that it would have on her prospects for future employment.  These factors further cast doubt on whether Venus would have been able to contribute an additional 32.5 hours per week to household services for the remainder of her life activities.

86.  The Court finds that a discount factor of 40% applied to Scenario A reasonably accounts for the additional limitations in Venus's ability to work outside the house and her ability to contribute household services. Application of this discount would result in total economic losses of approximately $103,802.

87.  Venus suffered before she died and was visibly anxious and distraught and apparently aware that she was dying.  She is due a reasonable award for her

pain and suffering. A reasonable award for her pain and suffering is $75,000, or roughly 3/4 of the total economic losses.

88. Venus's spouse and children have been deprived of the unique support, companionship, and guidance that she could provide. Venus's spouse and children have suffered greatly from the loss of comfort, care, companionship, and society that Venus provided. Venus's family is due a reasonable award for their loss of consortium and the care of their spouse and mother, on top of the economic losses. A reasonable award for their wrongful death and loss of consortium and care claims is $75,000, or roughly 3/4 the total economic losses.

From the foregoing findings of fact, the Court makes the following:

## II. CONCLUSIONS OF LAW

### A. JURISDICTION AND VENUE

1. Plaintiff properly exhausted his administrative remedies under the FTCA by submitting administrative tort claims to the IHS on January 31, 2014. The plaintiff filed his complaint in this Court on August 18, 2014, more than six months after submitting his administrative claim, without a final determination by the agency. This Court possesses subject matter jurisdiction of the plaintiff's claim, pursuant to 28 U.S.C. § 1346(b)(1).

2. Venue is proper in the District of Montana, because the plaintiff resides in the District of Montana. 28 U.S.C. § 1402(b). Further, venue is appropriate in

the Great Falls Division, pursuant to L.R. 1.2(c)(3) and 3.2(b)(1)(A) and (B), as plaintiff resided in Blaine County at the commencement of this action, and the alleged acts or omissions occurred in Blaine County.

B.   APPLICABLE LAW

3.   The burden of proof in a civil action remains the same regardless of whether the finder of fact is a judge in a bench trial or a jury.  Cabrera v. Jakabovitz, 24 F.3d 372, 380 (2d Cir. 1994), cert denied, 513 U.S. 876 (1994).  A plaintiff bears the burden of satisfying the finder of fact that he or she has proven every element of their claim by preponderance of the evidence.  Preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved is more likely true than not true.

4.   Under the FTCA, the United States is liable for torts committed by its agencies and employees in the same manner and to the same extent as a private individual under like circumstances, in accordance with the law of the place where the act or omission occurred.  28 U.S.C. § 2674.  Applicable state law must be the source of the claim for relief.  Trobetta v. United States, 613 F. Supp. 169 (D. Mont. 1985).

5. Under Montana law, the four essential elements of a negligence claim are: (1) duty; (2) breach of duty; (3) causation; and (4) damages. <u>Wiley v. City of Glendive</u>, 900 P.2d 310, 312 (Mont. 1995).

6. To establish a duty and breach in a medical negligence claim under Montana law, a plaintiff initially must satisfy a two-part threshold obligation: (1) evidence must be presented to establish the standard of professional care in the type of case involved; and (2) it must be shown that the physician departed from this recognized standard in his/her treatment of the plaintiff. <u>See</u> <u>e.g.</u>, <u>Gilkey v. Schweitzer</u>, 983 P.2d 869, 871 (Mont. 1999). Moreover, it must be established that the departure from the standard was the proximate cause of injury to the plaintiff. <u>Montana Deaconess Hospital v. Gratton,</u> 545 P.2d 670, 673 (Mont. 1976); <u>Falcon v. Cheung</u>, 848 P.2d 1050, 1055 (Mont. 1993).

7. In medical negligence cases such as this, "comparative negligence does not apply where a patient's pre-treatment behavior merely furnishes the need for care or treatment which later becomes the subject of a malpractice claim." Harding v. Deiss, 2000 MT 169, ¶16. Venus's health habits before seeking medical treatment are "merely a factor the physician should consider in treating the patient," not evidence of fault that may offset against any negligent acts by the IHS health care providers. Harding ¶16. The only negligent acts of a patient that may be considered in a comparative negligence scheme are acts contemporaneous with or

subsequent to treatment. Harding ¶16. Neither party presented evidence of any negligent conduct by Venus during or subsequent to treatment by Dr. Kroeger. Contributory or comparative negligence does not apply here.

C.    STANDARD OF CARE

8.  Dr. Kroeger holds no board certification.  "[A] non-board-certified general practitioner is held to the standard of care of a 'reasonably competent general practitioner acting in the same or similar community in the United States in the same or similar circumstances.'" Chapel v. Allison, 785 P.2d 204, 210 (Mont. 1990).  "'Similar circumstances' permits consideration by the trier of fact of legitimate local factors affecting the ordinary standard of care including the knowledge and experience of the general practitioner, commensurate with the skill of other competent physicians of similar training and experience, with respect to the type of illness or injury he confronts and the resources, facilities and options available to him at the time." Id. at 210.  A physician's individual practice, however, is not relevant to the standard of care.  Norris v. Fritz, 270 P.3d 79, 87 (Mont. 2012).

9.  Here, "similar circumstances" includes the training that Dr. Kroeger received while she attended the emergency medicine residency at the Washington University School of Medicine and her experience at the Ft. Belknap ED beginning in March of 2013. As noted previously in paragraph 67, however, the Court found

that Dr. Kroeger's treatment violated the standard of care for a general practitioner, and likewise violated the standard of care for a general practitioner with Dr. Kroeger's residency training in emergency medicine.

10. The Court concludes that Dr. Kazemi is a respected and credible emergency room physician who is qualified to testify on the applicable standard of care in this matter. The evidence and testimony in this case supports Dr. Kazemi's opinion that Dr. Kroeger violated the standard of care. Dr. Kazemi determined that the standard of care required Dr. Kroeger to establish a viable airway for Venus as quickly as possible after she fell into respiratory/cardiac arrest.

11. Dr. Kroeger's delay between the first and second intubation attempt and her failure to administer a paralytic to Venus after the first failed intubation attempt violated the standard of care, and these violations of the standard of care caused Venus's death.

## III. ORDER

Accordingly, IT IS HEREBY ORDERED, pursuant to Fed. R. Civ. P. 58, that the Clerk of Court enter judgment by separate document in favor of the plaintiff and against the defendant.

IT IS FURTHER ORDERED that plaintiff is entitled to such costs as are authorized by law.

IT IS FURTHER ORDERED that the Clerk of Court shall notify the parties of the making of this order.

DATED this 13th day of January, 2017.

_____
Brian Morris
United States District Court Judge